UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

ANDREW CLAYTON,                          No. _____

    Petitioner,

    v.

DERRAL G. ADAMS, Warden,
Corcoran State Prison,

    Respondent.
_____/

**PETITION FOR WRIT OF HABEAS CORPUS**

**AND**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

David McNeil Morse, #66923
Attorney at Law
595 Market Street
Suite 1350
San Francisco, CA 94105
(415) 974-1175

Attorney for Petitioner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

PETITION FOR WRIT OF HABEAS CORPUS .......................................... 1

FACTS ESTABLISHING THAT PETITIONER WAS DENIED HIS RIGHTS
          TO DUE PROCESS, AND FAIR TRIAL WHEN THE TRIAL
          COURT EXCLUDED EVIDENCE OF PRIOR, EXCULPATING
          STATEMENTS MADE BY A WITNESS WHO REFUSED TO
          TESTIFY AT TRIAL........................................................................ 3

VERIFICATION .......................................................................................... 6

MEMORANDUM OF POINTS AND AUTHORITIES ................................ 7

STATEMENT OF THE CASE...................................................................... 7

STATEMENT OF TRIAL EVIDENCE CONCERNING THE OFFENSE ..... 8

A. Prosecution case ....................................................................................... 8

B. Defense case ............................................................................................ 14

ARGUMENT .............................................................................................. 16

THE STATE COURT VIOLATED PETITIONER'S FEDERAL
          CONSTITUTIONAL RIGHT TO DUE PROCESS BY REFUSING
          TO ADMIT PRIOR, EXCULPATING STATEMENTS MADE BY
          A WITNESS WHO REFUSED TO TESTIFY AT TRIAL ...................... 16

A. Petitioner's contention in the state court proceeding .................................................... 16

B. The state court's adjudication of petitioner's case was contrary to, or involved
          unreasonable application of, clearly established federal law,
          as determined by the Supreme Court of the United States ............. 20

CONCLUSION ........................................................................................................... 22

# **TABLE OF AUTHORITIES**

## **Cases**

Chambers v. Mississippi, 410 U.S. 284 (1972)................................................................17

Chia v. Cambra, 360 F.3d 997, 1003-1004 (9th Cir. 2004)...........................................20

Lockyer v. Andrade, 538 U.S. 63, 71 (2003) ................................................................20

People v. Green, 3 Cal.3d 981, 988-989 (1971).............................................................17

People v. Hitchings, 59 Cal.App.4th 915, 921-922 (1997) ............................................18

People v. O'Quinn, 109 Cal.App.3d 219, 225-226 (1980)..............................................18

People v. Perez, 82 Cal.App.4th 760, 764-765 (2000) ..................................................18

People v. Williams, 16 Cal.3d 663, 669 (1976) .............................................................18

## **Statutes**

28 U.S.C. section 2254(a) ...............................................................................................1

28 U.S.C. § 2254(d)........................................................................................................20

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

No. _____

ANDREW CLAYTON,

    Petitioner,

    v.

DERRAL G. ADAMS, Warden,
Corcoran State Prison,

    Respondent.

_____/

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner ANDREW CLAYTON, by and through his counsel, respectfully petitions this court for a writ of habeas corpus, and by this verified petition sets forth the following facts and causes for the issuance of said writ:

I.

Petitioner is unlawfully incarcerated and restrained of his liberty in violation of his fundamental rights under the Constitution and laws of the United States of America at Corcoran, California, by James Tilton, Secretary of the California Department of Corrections and Rehabilitation, and Derral G. Adams, Warden of Corcoran State Prison. Petitioner is therefore in custody within the meaning of 28 U.S.C. section 2254(a).

II.

Petitioner is being held pursuant to a judgment pronounced by the Marin County Superior Court, the Honorable John Stephen Graham, issued on September 12, 2003 in Action No. SC112594, which requires petitioner to serve a sentence of 35 years to life for first degree murder of Christopher Deming. Petitioner is not serving any other sentence, and

- 1 -

has no future sentences to serve after completion of the sentence imposed by the above judgment.

III.

Petitioner at all times pleaded not guilty, and stood jury trial. Petitioner did not testify at trial. His conviction was affirmed by the California Court of Appeal, First Appellate District, Division Three, on direct appeal in Case No. A104581 in an unpublished opinion issued on September 20, 2006. (See Slip Opinion of the Court of Appeal in Case No. A104581, a true copy of which is attached hereto and incorporated herein by reference as Exhibit A to this petition.) Petitioner's petition for review in the California Supreme Court (Case No. S147560) was denied on December 20, 2006.

IV.

Throughout the superior court proceedings, petitioner was represented by Tara Higgins, whose address is 4340 Redwood Highway, Suite F-119, San Rafael, CA 94903. In his direct appeal, petitioner was represented by Mark D. Greenberg, whose address is PMB No. 429, 484 Lake Park Avenue, Oakland, CA 94610.

V.

Petitioner's sentence has been unlawfully and unconstitutionally imposed in violation of his federal constitutional rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution because, in violation of petitioner's above-listed federal constitutional rights to due process and fair trial, the trial court excluded evidence of prior, exculpating statements made by a witness who refused to testify at trial.

**FACTS ESTABLISHING THAT PETITIONER WAS DENIED HIS RIGHTS TO DUE PROCESS, AND FAIR TRIAL WHEN THE TRIAL COURT EXCLUDED EVIDENCE OF PRIOR, EXCULPATING STATEMENTS MADE BY A WITNESS WHO REFUSED TO TESTIFY AT TRIAL.**

1. In an interview with the prosecutor, jail inmate Paul Outcalt said he had known George Minaidis all his life. He said a conversation occurred when Outcalt was helping Minaidis move his shop. For some reason Minaidis got angry with Outcalt about something, calling Outcalt weak, and asserting that he had "'killed that guy'" and that he was there the night he was killed. (CT 3038.)[1]

2. In an interview with defense counsel and her investigator, Outcalt stated that he knew all the group involved in this case. (CT 3043.) Outcalt knew Minaidis for many years, and in the winter of 2000, Outcalt was helping Minaidis move his shop. This was when Minaidis stated that he, Minaidis had been at the scene and that "'Andy didn't shoot him.'" In fact, Minaidis was the shooter. Outcalt did not press for any further information and did not want to hear any more about this. (CT 3043.)

3. On June 3, 2003, Outcalt was brought to court where an attorney was appointed to represent him for these proceedings. The next day, June 4, there was a hearing where his attorney informed the court that he would refuse to testify. (RT 3257-3260.) Outside the presence of the jury, Outcalt was nonetheless sworn in. The prosecutor elicited from Outcalt that in January, 2000 Outcalt had been a methamphetamine user, and had been arrested for assault and battery on a police officer, possession of deadly weapons, paraphernalia, and resisting arrest. (RT 3261.) When asked whether he was ever at George Minaidis shop sometime after January 22, 2000, Outcalt refused to answer. (RT 3261-3262.) When the Court ordered him to answer, Outcalt said, "Yes," whereupon the Court took over the examination. In subsequent examination by both the court and the prosecutor, Outcalt

---

[1]"CT" refers to the Clerk's Transcript on Appeal and "RT" refers to the Reporter's Transcript on Appeal in petitioner's direct appeal, A104581.

testified that he had had a conversation with Minaidis in 2000 concerning the Deming murder, and that he remembered the conversation, and that the conversation occurred in Novato.  However, he then refused to answer a question about methamphetamine use by Minaidis.

3. When the Court ordered him to answer, Outcalt inquired what would happen if he did not.  When the Court explained that he would receive additional, uncreditable time for contempt, Outcalt indicate his choice by refusing to answer any more questions placed to him either by the prosecution or the defense.  (RT 3264-3270.)

4. Outcalt, over the course of the trial, was brought back four more times, once on June 5, once on June 10, once on June 17, and once on June 19.  On each occasion he expressly refused to testify.  (RT 3392, 3383, 3817-3819, 4074-4075.)  On the last day, the defense made a motion for the admission of Outcalt's extrajudicial statements on the ground that they were statements against interest (RT 4080, 4085.)  Counsel also argued expressly that under the circumstances of this case, precluding this exculpatory evidence would constitute a violation of constitutional due process.  (RT 4083-4085.)

VI.

Petitioner alleges that the adjudication of this claim in state court resulted in a decision that was contrary to, or involved unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and/or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

VII.

By this reference, the accompanying memorandum of points and authorities and exhibits are made part of this petition as if fully set forth herein.  Petitioner's claims under this petition will be based on the petition, the accompanying points and authorities, the exhibits attached hereto, all records, documents, and pleadings on file with the Marin

- 4 -

County Superior Court in <u>People v. Andrew Clayton</u>, No. SC112594; with the California Court of Appeal, First Appellate District, in <u>People v. Andrew Clayton</u>, No. A104581; and with the California Supreme Court in <u>People v. Andrew Clayton</u>, No. S147560, and any further material to be developed at any future hearings which may be ordered.

WHEREFORE, petitioner respectfully requests that this court:

A.  Take judicial notice of the court records specified above;

B.  Order respondent to (a) furnish a complete copy of the Reporter's and Clerk's Transcripts of the state court proceedings; (b) file an answer responsive to the factual allegations of the petition; and (c) show cause why petitioner is not entitled to the relief sought;

C.  Conduct a hearing at which proof may be offered concerning the allegations in this petition or any affirmative defenses raised by respondent;

D.  After full consideration of the issues raised in this petition, grant the petition, vacate the judgment and sentence imposed upon petitioner in Marin County Superior Court Action No. SC112594; and

E.  Grant petitioner such further relief as is appropriate in the interests of justice.

Dated: March 20, 2008                           Respectfully submitted,

 

 

_____
DAVID McNEIL MORSE
Attorney for Petitioner

- 5 -

## **VERIFICATION**

I, the undersigned, declare:

1. I am an attorney duly licensed to practice law in the State of California. I am the attorney for petitioner herein, who is confined at the Corcoran State Prison in Corcoran, California.

2. I am authorized to file this petition for writ of <u>habeas</u> <u>corpus</u> on petitioner's behalf.

3. I make this verification because petitioner is incarcerated in a county different than that of my law office, and because these matters are more within my knowledge than his.

4. I have read the foregoing Petition for Writ of <u>Habeas</u> <u>Corpus</u> and believe that the matters stated therein are true. On that basis, I allege that they are true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 20, 2008, at San Francisco, California.


DAVID McNEIL MORSE

### MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF THE CASE

In an information filed on March 28, 2002, the District Attorney of Marin County accused petitioner of murder (§ 187),[2] attempted residential robbery (§§ 664, 211, 212.5), burglary (§ 459), and possession of methamphetamine for sale (H&S Code, § 11378).  In connection with the murder, felony-based special circumstances for robbery and burglary were alleged.  (§§ 190.2(a)(17)(A) and (G).)  Personal use of a firearm (§ 12022.5) and personal use of a firearm to cause death (§ 12022.53(d)) were alleged in connection with the murder and attempted robbery; personal infliction of great-bodily injury (§ 12022.7) was alleged in connection with the murder, attempted robbery, and burglary.  (CT 1741-1745.)

Following several weeks of pretrial motions, jury trial began on April 23, 2003.  (CT 2939.)  The prosecution's case-in-chief began on May 12 (CT 2958); the defense case-in-chief began on June 18, and a short rebuttal was presented on June 19 (CT 3029, 3031); the case was submitted to the jury on June 25 (CT 3202); verdicts were rendered on July 1.  (CT 3227.)  Petitioner was found guilty of first degree murder, attempted robbery, and burglary, but was acquitted of possession of methamphetamine for sale.  (RT 4494-4495.)  Personal gun-use was found true on all the counts of conviction (RT 4494-4495), but the jury deadlocked on all other special allegations, for which the trial court, accordingly, declared a mistrial.  (RT 4495-4505.)

Petitioner was sentenced on September 12, 2003.  For first-degree murder with the enhancement he was sentenced to an aggregate term of 35-years to life.  Sentences for robbery and burglary were stayed pursuant to Section 654.  (CT 3288-3289.)  On October 8, the mistried allegations were dismissed.  (CT 3293-3294.)

---

[2]All statutory references are to the California Penal Code unless otherwise specified.

A timely notice of appeal was filed, giving rise to petitioner's direct appeal. (CT 3296.) On September 20, 2006, the Court of Appeal issued an opinion affirming the conviction. On December 20, 2006, petitioner's petition for review in the California Supreme Court (Case No. S147560) was denied.

## STATEMENT OF TRIAL EVIDENCE CONCERNING THE OFFENSE

### A. Prosecution case

At 6 a.m. on Friday morning, January 20, 2000, Matt Cady and his friend, Christopher Deming, met another friend, Don Phillips at the San Francisco airport for a day-trip to Las Vegas. The excursion was to provide Phillips with one last celebration before he went to prison for dealing methamphetamine. Cady himself was a methamphetamine dealer and testified at trial in the instant case under a grant of immunity. According to Cady, he and Deming arrived back in San Francisco at about 9:30 that evening, and by 11 had arrived at Cady's house, where he lived with his mother, at 1681 Indian Valley Road in Novato. (RT 2981, 2993-2994, 3054-3058.) They went to the shed that Deming and Cady had built near the driveway as a sort of hang-out, and where Cady sometimes would spend the night. (RT 1946-1948, 2983.)

Shortly after midnight, another friend, Paris Stephens stopped by to visit. The three dozed off in the course of the early morning hours. Sometime before 4 a.m., Deming hit Cady on the leg waking him up and saying he thought someone was outside. Almost immediately, the light on Cady's motion-sensor, which he had rigged to activate only inside the shed when triggered from the outside, lit up. Cady dismissed Deming's concern, stating that it was probably the cat and told Deming to open the door and see. (RT 1933-1934, 2997-2998, 3022.)

Cady testified that as soon as Deming opened the door, he screamed and immediately pushed the door shut, bracing it against some outside force, which then pushed back, forcing the door of its hinges. When the door slid off Deming, he stood at the threshold wrestling

with a much shorter masked man armed with a gun. Cady, in the meantime, grabbed a baseball bat. (RT 2998-3000.) From behind Deming, Cady, trying to position himself with the bat, could see a second, taller masked man around the corner of the threshold to the shed. This man stepped forward two or three stops, pointed a gun at Deming's chest, and then fired a shot. (RT 3001-3003, 3005, 3010.) Deming, crying out, nonetheless pushed the shorter man with whom he was wrestling outside the shed, and both men fell to the ground continuing the struggle while Cady pursued the shooter who had immediately run out the gate and down the driveway. (RT 3003-3004, 3021.) The latter, from the top of the driveway, about twenty yards away, issued a warning to Cady to stop chasing him or he would be shot. Cady retreated back to the shed where Deming and the shorter men were still wrestling. (RT 3021-3024.)

Deming kept crying out to Cady to get the gun out of his assailant's hand. Cady began beating the masked man with the bat about his head and body. Cady peeled off the mask, recognizing Ross Calkins, whom Cady had known for several years. (RT 2986-2987, 3025-3026.)

Cady ran to the house to get his help for Deming, and Calkins ran away. (RT 3027, 3042-3045.) Deming was taken to the hospital, where he died from a gunshot wound that entered his left chest, traversed his heart and lungs and exited his right chest. (RT 1985-1986, 2204-2213.)

Calkins testified at trial, and identified petitioner as the second assailant, who had shot Deming on January 22. (RT 3226.) Calkins testified as an accomplice in first-degree murder; in exchange, he was allowed to enter a plea of guilt to voluntary manslaughter. By the time he testified, judgment had already been imposed and Calkins was under a determinate sentence of 28 years. (RT 3234-3235.)

Calkins was released on parole from a prior incarceration in April, 1999. (RT 3138.) He spent much of his time at George Manaidis's autoshop in Bel Marin Keys, playing with

cars and ingesting methamphetamine, which he obtained either from George or from Gigi Babineaux, who was in business with petitioner selling the drug. In fact, Calkins had a proprietary interest in Babineaux's product, since he supplied the capital investment. According to Calkins, there had been a discussion at Calkins' house in Petaluma between him, Babineaux, and petitioner. They were going to go into the methamphetamine business with Calkins providing the seed money and then financing the operation with $1600 to $2000 every two weeks. As a fringe benefit, Gigi allowed Calkins to dip into the product without paying the retail price. (RT 3138-3140, 3144-3146, 3176, 3185-3186.) Calkins had obtained the start-up money by breaking into the house of a former employer who had fired Calkins. Calkins stole $8000, of which he gave Babineaux and petitioner $4000. (RT 3141-3143, 3443-3445.)

On Friday, January 21, 2000, Calkins proceeded to Manaidis's shop and was there using methamphetamine for about an hour and half when petitioner and Gigi Babineaux showed up. (RT 3153-3154.) During the evening, Babineaux received a phone call that upset her; petitioner also talked to the caller and seemed a bit angry afterward. She explained that the call was from Don Phillips, for whom they had to buy a ticket to bring him back from Las Vegas. She said that Phillips had gone to Las Vegas with Matt Cady to buy a supply of methamphetamine, but Cady had taken the dope and had abandoned Phillips in Las Vegas. petitioner and Manaidis were standing there when Babineaux was speaking to Calkins. (RT 3159-3161, 3167-3168.)

According to Calkins, Babineaux and petitioner then devised a plan to go over to Cady's place and get the methamphetamine back, and asked Calkins to help them. Calkins assumed that Minaidis would also participate. (RT 3171.) However, there was some discussion in which Manaidis stated that he had dealt with Cady a lot and that Cady would recognize him if he went. (RT 3171-3172.) At some point, it was firmly decided that Manaidis would not go. (RT 3172.)

After midnight, Calkins, petitioner, and Babineaux left Manaidis's shop in their separate cars and met at petitioner's house, where petitioner and Calkins armed themselves and obtained stockings to use as masks. (RT 3195-3196; 3202-3203.) Calkins was given a .357 magnum, and petitioner carried a semiautomatic in a holster. (RT 3195-3196.) Calkins and petitioner left in the Camaro, with Babineaux following in petitioner's Ford Ranger. Cady's house was only a couple of miles away. (RT 3216-3219.)

Calkins parked around the corner from Cady's house. After ingesting some methamphetamine, the two men exited the car and walked up the driveway. They approached the shed, masks down, guns drawn, with Calkins on the left and petitioner on the right. (RT 3219-3225.)

Before they reached the door of the shed, it flung open; someone rushed out. petitioner lifted his right hand and then fired a shot. Calkins started wrestling with the man over the .357, and then began to feel blows from a baseball bat. Calkins recalled Cady yelling at Calkins by name, demanding to know why Calkins was trying to ruin Cady's business; Calkins remembered asserting that Cady had ripped someone off, and that Cady denied it. In any case, Calkins passed out from the beating.

Calkins wandered about the area and was later arrested as he was being driven to the hospital by a homeowner that he had asked for help. (RT 2058-2061.) Petitioner was arrested in a trailer on his parents' property in Novato. (RT 2525, 2591-2606.)

At the scene of the crime, the police recovered a .357 magnum revolver near Deming's body. (RT 1983-1984, 2069.) The gun was operable, and was fully loaded with unfired rounds. (RT 2659, 3694.) In the master bedroom in petitioner's house, the police recovered an empty gun case in which the .357 recovered from the scene could have fit. (RT 2877-2878.) On the cement stoop just outside the shed where Deming had been shot, the police recovered a fired casing stamped with the letters ELD and marked with .40 SNW, meaning a .40 caliber Smith & Wesson. (RT 2171, 2245-2246.) A bullet hole was found on

the far wall of the shed in a location consistent with the description of the shooting. On the other side of this wall was an attached storage place. The police searched inside this area and discovered a deformed bullet lying inside an old tire. (RT 2171-2172, 2178-2185.)

William Gahan, a workers' compensation attorney and a licensed gun dealer, testified that in March, 1999 he sold  petitioner a  .40 caliber semiautomatic pistol, a model 4006 Smith & Wesson. The transaction was legal and the firearm was licensed to petitioner after a background check by the DOJ. (RT 2098-2102.) The police recovered a box for a Model 4006 Smith & Wesson from the trailer where petitioner was arrested, and Gahan identified the box, on which the serial number of the pistol was displayed. (RT 2105, 2688-2689.) A ballistics expert testified for the prosecution that the general class characteristics impressed on the deformed bullet recovered from the storage area of the shed were not inconsistent with the bullet's having passed through the barrel of some Smith & Wesson, Model 4006. (RT 3681-3682.)

In addition to the box for the Smith & Wesson, the trailer was full of live ammunition, both loose and in boxes for a .40 caliber Smith & Wesson, most of which was marked ELD of the manufacturer Eldorado. (RT 2607, 2675-2682, 2688-2689.) Some live rounds were found in the backyard. (RT 2689-2694.) On the dresser in the master bedroom the police found two live ELD brand .40 caliber rounds of ammunition. One of the rounds, however, had been cycled through a gun and had extractor marks on it. These marks were, according to the prosecution's ballistics expert, highly consistent with the extractor marks imprinted on the fired shell recovered at the scene of the shooting. (RT 2879, 3685-3686.)

Shortly after the shooting, one of the deputies assigned to the scene walked along Indian Valley Road in search of evidence. A few houses down from Cady's residence, he discovered on the shoulder of the road what appeared to be two pair of women's stockings and a pair of yellow dish gloves. (RT 2014-2016, 2125-2127.) There were fresh tire tracks

nearby; a casting was made and later comparison showed that the impression was not inconsistent with the left-rear tire of Ross Calkins' Camaro.  (RT 2127, 2910-2914.)

One of the masks recovered had dried blood on it.  It was tested for DNA, and the profile obtained from the cuttings was consistent with the known blood sample taken from Ross Calkins.  (RT 2048-2049, 2255-2256, 3874-3879.)  In the second mask, there was trace evidence of hair fragments, two of which were human hairs, while the rest were animal hairs.  The color and characteristics of these fragments were consistent with known samples of scalp hair from petitioner, while the known samples from Calkins and Manaidis were excluded.  (RT 2258-2259, 2266-2267, 2384-2386, 2404-2406, 2409-2410, 2411, 2418-2419, 2479.)  The hair fragments were also tested for DNA.  Since it proved impossible to obtain a profile from any nuclear DNA on the fragments, they were retested for mitochondrial DNA, and showed a profile consistent with that of petitioner's mitochrondrial profile, to the statistical exclusion of 99 per cent of the population.  (RT 2787, 2795-2806, 2846-2848.)  Calkins and Manaidis were specifically excluded.  (RT 2842-2846.)

The second mask itself and the rubber dish gloves were tested for nuclear DNA.   On the mask, there was a mixed sample consisting of DNA from at least three individuals, with at least a male and a female in the mixture.   petitioner's profile could not be excluded; Calkins' could; the results were inconclusive as to Manaidis. (RT 3886, 3888-3783.)  For the left glove, there was a mixture of DNA from multiple persons, at least one of which was a male and one of which was a female.  petitioner's profile could not be excluded  from the sample; Calkins' and Manaidis's could.  (RT 3895-3896.)  As to the right glove, petitioner's profile was consistent at a frequency of 1 in 4.3 quadrillion individuals.  Manaidis and Calkins were excluded.

Finally, the prosecution presented evidence of testing for gunshot residue emitted when a handgun has been fired.  The thumb, webbing, and index finger of both of petitioner's hands were tested.  Two particles of gunshot residue were found on the right

hand. As attested by the prosecution's expert, even if the person firing a gun was wearing rubber gloves, that person could have picked up residue after removing the glove and holding the fired weapon in his or her hand. (RT 2661-2663, 2666-2667, 2732-2735.)

**B. Defense case**

The defense evidence showed petitioner to be using the trailer behind his house as a sort of factory for refurbishing expended shotgun shells by reloading them with fresh primer. There was a market for this among hunters and skeet shooters in order to save money on ammunition, and in the trailer there was a work bench, a reloader, and a quantity of smokeless gunpowder designed only for shotgun shells. (RT 3937-3939, 3942.) The defense expert collected some items used for this purpose, and they revealed gunshot residue. This, however, was not surprising, according to the expert, since in the environment presented by the inside of the trailer, the presence of large amounts of gunshot residue would be no more surprising than the presence of motor oil in a car engine. (RT 394-3942.) But this evidence and more went beyond raising a doubt as to whether petitioner was the shooter. There was evidence to cast doubt on whether he was even present at the scene.

Calkins had petitioner holding the .40 caliber handgun in petitioner's right hand. (RT 3224-3225.) According to Matthew Cady, however, the shooter fired left-handed. (RT 3008-3009, 4152.)[3] Although Cady provided this exculpatory inconsistency, he was, nonetheless certain that the shooter was not George Manaidis, whom he knew, and whose physical features were not consistent with petitioner's. However, a neighbor of Cady, testifying for the defense, was awake that morning when the shooting occurred. A little before the shooting, she had heard a voice say, "Matt, you are drunk again." (RT 4032-4034.) In addition, after the shot was fired, she went to her window and saw a man with dark facial hair running from the scene being chased by Matt Cady. (RT 4034-4036.) This

---

[3]There was no gunshot residue on the sample taken from Clayton's left hand. (RT 2667, 2735.)

description was consistent with George Manaidis's features and not with petitioner's. (RT 4023-4025.)

In regard to the robbery itself, the evidence was recounted how Minaidis was involved it the planning. But there was also evidence that he was involved with the suppression of evidence after the robbery-homicide. Minaidis also showed solicitude toward Calkins after the latter's arrest, visiting him in jail immediately afterwards, and then communicating with him later when Minaidis was a fellow inmate. Minaidis communicated to Calkins that he, Minaidis, would help him by saying that all of this was Andy's and Gigi's plan, and that all Ross had to do was let George know by passing messages through Ross's father; once through this medium, Minaidis issued Calkins the encouraging admonition, "We got to stay down and we can't let them break us up." (RT 3337-3339, 3424-3328.) Calkins, for his part, was worried about retaliation from the friends of George Minaidis. (RT 3430-3431.)

**ARGUMENT**

**THE STATE COURT VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS BY REFUSING TO ADMIT PRIOR, EXCULPATING STATEMENTS MADE BY A WITNESS WHO REFUSED TO TESTIFY AT TRIAL**

**A. Petitioner's contention in the state court proceeding**

The defense in this case was that petitioner was not present at the scene of the robbery/homicide and was not in fact the person who had shot Christopher Deming. There were two main corollary themes: Ross Calkins was lying, and George Minaidis was the shooter. In regard to this latter issue, the defense was blocked by Minaidis's invocation of his Fifth Amendment rights. (RT 1469, *et seq.*, 1563-1564), but in the midst of trial, apparently admissible and competent evidence emerged pertinent to this the culpability of George Minaidis. Paul Outcalt, a member of the group of people involved in this case, told both the District Attorney and the defense that in January, 2000, Minaidis confessed to Outcalt that he, Minaidis, was the shooter and had killed Christopher Deming. (CT 3037-3038, 3043.) Outcalt, who spoke freely to investigators from either side, refused to testify when brought into court and even when held in contempt for his refusal to obey the court order that he answer questions put to him. The court, however, refused to admit into evidence any of Outcalt's prior statements regarding the admissions made by George Minaidis. (RT 4164.)

The defense theory was that the statements were declarations against interest, first for Minaidis in making self-incriminatory statements, and secondly for Outcalt, a member of a criminal community, in reporting these statements to the authorities. (RT 4080, 4085.)[4] The

---

[4]Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community

trial court, although finding both Minaidis and Outcalt unavailable as witnesses – the former for a valid invocation of the Fifth Amendment privilege, while the latter for simply refusing to testify (see People v. Francis, 200 Cal.App.3d 579, 587 (1988)) – nonetheless found that the hearsay exception did not apply because the statements were not against the penal interest of Outcalt. (RT 4161-4164.) Petitioner did not attack this portion of the court's ruling on appeal, nor does he do so here.

However, defense counsel also expressly invoked constitutional due process and argued that Outcalt's statements regarding Minaidis's admissions should have been admitted as prior inconsistent statements. (RT 4083-4085.) Petitioner argued this position on appeal in the state court, and contends here that the state court's rejection of this argument contrary to clearly established federal law as determined by the Supreme Court of the United States under section 2254(d). The Due Process Clause of the Fourteenth Amendment does not allow the preclusion of directly exculpatory evidence barred solely because of irrational or overly technical foundational requirements for a hearsay exception. See Chambers v. Mississippi, 410 U.S. 284 (1972) ("Chambers"). As will be elaborated in the following, such irrationality exists here, where, under California law, Paul Outcalt's prior statements are excluded because Outcalt expressly refused to testify (see People v. Rojas, 15 Cal.3d 540, 548 (1975)), while these very statements would have been admitted if Outcalt had simply chosen to fabricate a loss of memory *amounting* to a willful refusal to testify. See People v. Green, 3 Cal.3d 981, 988-989 (1971).

In Chambers v. Mississippi, supra, 410 U.S. 284, the defendant was charged with murder. Prior to trial, a third-party, one McDonald, had signed a confession to the murder and had made consistent inculpatory statements to others. At trial, the prosecution declined to call McDonald as a witness. The defense therefore did, but when McDonald denied

(..continued)
that a reasonable man in his position would not have made the statement unless he believed it to be true."

involvement and repudiated the confession, the defense was precluded, under Mississippi's "voucher" rule, from cross-examining McDonald or repudiating any of his direct testimony, insofar as the party calling the witness, under the rule, was bound by his testimony. (Id., at pp. 289-290, 294, 296-297.) The United States Supreme Court held that the application of these archaic and technical rules of evidence could not, under the specific circumstances prevented, be allowed to deprive the defense of crucial evidence, and that this had occurred constituted the denial of the right to a fair trial. (Id., at pp. 294, 297-298, 302.)

Here, the irrationality inheres in distinction made by the California Supreme Court in applying the foundational rules for prior inconsistent statements. Under California law, a prior inconsistent statement may be admitted after the declarant, on the stand and testifying, willfully and falsely claims no memory of the topic on which he or she is testifying. People v. Green, supra, 3 Cal.3d 981, 988-989. This rule is applicable even when the witness invokes memory loss for each and every question he or she is asked, leaving nothing of substance to cross-examine or impeach. People v. O'Quinn, 109 Cal.App.3d 219, 225-226 (1980); People v. Perez, 82 Cal.App.4th 760, 764-765 (2000). The situation is such that the witness has in effect refused to testify. However, if the witness expressly refuses to testify, instead of invoking a pretext to the same end, that witness's prior statements are deemed to be inadmissible hearsay. People v. Rojas, supra, 15 Cal.3d 540, 548; People v. Williams, 16 Cal.3d 663, 669 (1976); People v. Hitchings, 59 Cal.App.4th 915, 921-922 (1997). There is no substantive difference in this legal distinction, and it is a distinction, which, in the instant case, was "destructive of the truth-gathering process." (Chambers v. Mississippi, supra, 410 U.S. at p. 296, fn. 8.)

Outcalt made a statement both to the prosecution and the defense, which was well attested. The prosecution had a full array of possibilities for impeaching Outcalt, whether it was some qualifying felony conviction, some qualifying misdemeanor conviction, or the assessments of his character for truth and veracity from a percipient probation officer.

Certainly the evidence of Outcalt's connection with appellant would also be before the jurors in assessing the credibility of Outcalt's statement. In short, Outcalt was as available for impeachment, cross-examination, and rebuttal as he would have been if he simply repeated, "I don't remember" in front of the jury in response to each and every relevant question posed to him.

Finally, there can be no doubt that the evidence contained in Outcalt's prior statements was crucial to the defense. The only direct evidence that petitioner was the shooter of Christopher Deming was the testimony of Ross Calkins, an accomplice, whose credibility was not of the highest value. The physical evidence connecting petitioner with the crime was far from dispositive as corroborating Ross Calkins. The gunshot residue meant nothing in light of appellant's practice of reloading used shotgun shells. The DNA found in the gloves and stockings was not dispositive since these came from appellant's house. That these came from appellant's house were not dispositive because Gretchen Babineaux also lived at appellant's house. That Gretchen Babineaux lived there as appellant's girlfriend was not dispositive because Gretchen Babineaux seemed to be everybody's girlfriend, including Ross Calkins and probably George Minaidis.

George Minaidis too was deeply involved in the events of this case. If Ross Calkins, that reliable source of information, did not place George at the scene of the crime, Calkins certainly had Minaidis somehow encouraging the robbery of Matthew Cady. In addition, it was Minaidis who, according to Calkins' testimony, got rid of the murder weapon.

The evidence of Outcalt's statements would have provided direct evidence that Minaidis was the shooter. In his prior statement to the defense investigator, Outcalt even had Minaidis announcing expressly that appellant did not do it. But even if this is discounted, there were only two assailants, one of whom was undisputedly Ross Calkins, so that any admission by George Minaidis that he, Minaidis, was the shooter, thereby exculpated appellant. Precluding this evidence because Paul Outcalt refused to testify

- 19 -

instead of getting on the stand to falsely claim a lack of memory, was a violation of the Due Process Clause of the Fourteenth Amendment.  Chambers v. Mississippi, supra, 410 U.S. 284.

###### B. The state court's adjudication of petitioner's case was contrary to, or involved unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a federal habeas court may grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if the state court adjudication resulted in a decision that (1) was contrary to clearly established federal law as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States.  Id. § 2254(d)(1); see also Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

Here, the state court applied the rule of Chambers to the facts of the case in an objectively unreasonable manner.  Chia v. Cambra, 360 F.3d 997, 1003-1004 (9th Cir. 2004).  As noted above, Chambers held that when a hearsay statement bears "persuasive assurances of trustworthiness" and is critical to the defense, it may not be excluded by a "mechanistic" application of state hearsay rules.  The trial court's decision to exclude Outcalt's statements in petitioner's case was without any reasonable basis and, as such, was just the kind of mechanistic application of state hearsay rules that Chambers forbids.  Chia v. Cambra, supra, 360 F.3d at p. 1006-1007.

In Chia, the Ninth Circuit considered a case that bears a striking resemblance to the instant case.  The statements of one Wang, which tended to exonerate the defendant, were excluded from evidence based on a mechanical application of state hearsay rules.  The state

courts affirmed the defendant's conviction, but the Ninth Circuit reversed the district court's denial of habeas relief pursuant to section 2254. The court held that the state court's misapplication of <u>Chambers</u> case was "without ... reasonable basis," and that Chia's due process rights had been violated. The exclusion of Outcalt's statements in petitioner's case likewise violated petitioner's due process rights, and the state court's adjudication of petitioner's claims was likewise unreasonable. Petitioner is entitled to relief, and the writ should issue.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## **<u>CONCLUSION</u>**

For the foregoing reasons, petitioner requests that the court grant the relief requested in his Petition for Writ of <u>Habeas</u> <u>Corpus</u>.

Dated: March 20, 2008                                 Respectfully submitted,


_____
DAVID McNEIL MORSE
Attorney for Petitioner

- 22 -

Exhibit A

FOR EDUCATIONAL USE ONLY

Not Reported in Cal.Rptr.3d, 2006 WL 2686984 (Cal.App. 1 Dist.)
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts citation of unpublished opinions in California courts.


Court of Appeal, First District, Division 3, California.
The PEOPLE, Plaintiff and Respondent,
v.
Andrew Bernard CLAYTON, Defendant and Appellant.
No. A104581.
(Marin County Super. Ct. No. SC112594).
Sept. 20, 2006.

Office of the Attorney General, San Francisco, CA, for Plaintiff and Respondent.

First District Appellate Project, San Francisco, CA, Mark David Greenberg, Oakland, CA, for Defendant and Appellant.


PARRILLI, J.
*1 Andrew Bernard Clayton appeals his jury-trial conviction for first degree murder and other offenses. Appellant contends the trial court erred by excluding prior statements of an unavailable witness and by denying his motion to suppress evidence. We affirm.


# BACKGROUND

Appellant was accused of the following crimes on or about January 22, 2000: murder of Christopher Deming; attempted residential robbery; residential burglary; and possession for sale of a controlled substance (methamphetamine). The Information also alleged appellant committed the murder while engaged in robbery and burglary; discharged a firearm; personally used a firearm; and personally inflicted great bodily injury on Deming.

The People began its case-in-chief on May 12, 2003. The trial court instructed the jury on June 23, 2003, and the jury began deliberations after closing arguments on June 25, 2003. The jury returned its verdicts on July 1, 2003, finding appellant guilty on counts 1 through 3, and not guilty on count 4 (the drug charge). The jury also found true the allegations appellant personally used a firearm but deadlocked on the remaining allegations; the trial court declared a mistrial as to those allegations on which the jury deadlocked. On September 12, 2003, the trial court sentenced appellant to a prison term of 35 years-to-life. The abstract of Judgment was filed on September 17, 2003, and appellant timely filed a Notice of Appeal on November 4, 2003.

Appellant committed the murder of Christopher Deming during a botched, drug-related robbery. The train of events began on January 21, 2000 at around 10 p.m. Appellant, his girlfriend Gretchen Babineaux, Richard Calkins, and George Minaidis were at Minaidis's car repair shop in Novato when Babineaux received a cell phone call from Don

Phillips. Phillips said Matt Cady and Christopher Deming had left him in Las Vegas after stealing a quantity of methamphetamine from him. Appellant, Babineaux, Calkins and Minaidis devised a plan to go to Cady's house and get the methamphetamine. It was decided Minaidis would not go to Cady's house because Cady might recognize him, but he would stay in the area in case the others needed help. Appellant and Calkins armed themselves with handguns at appellant's house. They first washed the guns and bullets, taped their fingers, put on rubber gloves, stocking masks, and extra layers of clothing. Appellant and Calkins went together in Calkin's vehicle and Babineux followed in appellant's truck.

When they got to Cady's house, appellant and Calkins approached the shed Cady used for his drug business. Inside the shed were Cady, Deming, and Paris Stephens. The occupants of the shed were alerted to the presence of intruders by a sensor light inside the shed. Deming opened the door and was confronted by Calkins and appellant. As Calkins struggled with Deming, appellant fired a single gunshot into Deming's upper torso, then fled the scene. Cady grabbed a baseball bat and beat Calkins with it. Calkins fled on foot and was later apprehended near the scene. Police were dispatched to the Cady residence after receiving a report of an armed intruder. Deming was taken to Novato Community Hospital where he was later pronounced dead. Appellant was arrested in a trailer parked on his parents' property after police searched the house looking for him. Calkins testified for the prosecution at appellant's trial pursuant to a plea agreement, under which he pleaded guilty to voluntary manslaughter and received a sentence of 28 years.

## DISCUSSION

## I Exclusion of Prior Statement of Unavailable Witness

### A. Background
*2 During trial, on May 29, 2003, Deputy District Attorney Frugoli and investigator Harold Hutchinson contacted Calkins at the Marin County Jail. Calkins told them he had spoken briefly with an inmate, who in turn had spoken with another inmate known as "Helicopter Paul." "Helicopter Paul" told the inmate he had spoken with George Minaidis, and Minaidis stated he [Minaidis] was the shooter. Hutchinson later called the jail and determined "Helicopter Paul" was Paul Outcalt, currently housed in pod C at the jail. On May 30, 2003, Frugoli and Hutchinson returned to the jail to interview Outcalt.

Outcalt stated appellant was his supervisor at Kelleher Lumber. Outcalt said he previously had been housed with appellant in pod C, appellant was his "Big Brother" in the pod, but appellant had never discussed his case with Outcalt. Also, Outcalt stated he did not know Calkins was testifying against appellant at trial. Regarding Minaidis' admission, Outcalt stated he had known Minaidis all his life and at one time helped him move shop. Minaidis got annoyed about something and accused Outcalt of being weak. In his anger, Minaidis said words to the effect he had "killed that guy" and was there on the night of the murder. Outcalt told Minaidis he didn't want to hear about it, and Minaidis said nothing more. Also, Outcalt stated that at the time of this incident he was using a lot of dope; hence his mind was not clear about a lot of things.

On May 31, 2003, Frugoli and Hutchinson talked to Calkins again. They asked Calkins how he knew about Outcalt and Minaidis. Calkins said a pod mate named John Bixler was in a holding cell with Outcalt on the day after the trial began. During a conversation about appellant's case, Outcalt told Bixler he didn't know why Calkins was testifying against appellant because Minaidis admitted he shot Chris Deming. On June 2, 2003,

defense investigator Denise Garety interviewed Outcalt. Outcalt told Garety Minaidis admitted shooting Deming when Outcalt helped Minaidis to move shop in the winter of 2000. Outcalt stated he did not tell anyone about Minaidis' admission until some years later when he was in a holding cell with Bixler and Bixler told him Calkins was going to testify against appellant. When Outcalt heard this, he said: "that's bullshit because George Minaidis told me he shot Chris."

The court conducted a hearing pursuant to Evidence Code 402 to determine the admissibility of any testimony Outcalt might offer. The counsel appointed for Outcalt opined Outcalt was not entitled to assert a Fifth Amendment right not to testify. Outcalt testified he had a conversation with Minaidis about the Deming murder. However, Outcalt refused to respond to any other questions on the matter, even after the trial court cited him for contempt of court and ordered he not receive any credits against his sentence while held in contempt. Outcalt was brought back to court on several other occasions; each time he refused to testify.

**\*3** On June 19, 2003, appellant filed a motion in the trial court to admit statements made by Outcalt. On the same day, the trial court again ordered Outcalt to testify, but he again refused. The trial court ruled Outcalt was an unavailable witness and heard argument on the admissibility of his statements. The trial court found the circumstances surrounding Minaidis' statement to Outcalt were ambiguous because it was "some form of bluster that didn't impress, concern or frighten him [Outcalt], and in circumstances where Minaidis seems to have been frustrated and angered about something Outcalt says he couldn't figure out." The trial court noted Outcalt "reported both that Minaidis said he killed that guy, but also said that he was there the night the guy was killed, whatever the heck that means. It is obviously garbled." Further, the trial court concluded: "In any event, if you accept that, and I am not sure it's entirely clear that the Minaidis statement is sufficiently against penal interests to assure credibility, it appears to me that there is no statement of Mr. Outcalt which is sufficiently clearly against his interest to offer any assurance of credibility which would justify it being presented without cross-examination to the jury." In addition, the trial court found Outcalt's statement was unreliable because appellant was Outcalt's benefactor in the jail, Outcalt's report of the Minaidis statement was remote in time to the purported event, Outcalt's justification for the delay in reporting Minaidis' statement lacked credibility, and appellant and Outcalt lived together in C pod in 2001 for over two months. Moreover, the trial court concluded Outcalt's continued refusal to testify under oath, even after he was told his statements were public knowledge, suggested he "is concerned about being prosecuted now for making a false statement or for perjury, which he might end up doing if he were to testify." For all these reasons, the trial court ruled Outcalt's "hearsay statements are thoroughly unreliable and should not be introduced as a source of little more than confusion in this trial."

## B. Analysis

Appellant does not contest the trial court's ruling that Outcalt's statements were not against interest and were otherwise unreliable. Indeed appellant concedes this ruling is "unassailable" under In re Weber (1974) 11 Cal.3d 703.[FN1] Rather, appellant contends the exclusion of Outcalt's statements violated his due process rights under the Fourteenth Amendment of the U.S. Constitution. Appellant relies on the principle, announced by the high court in Chambers v. Mississippi (1973) 410 U.S. 284 ( *Chambers* ), that due process does not allow directly exculpatory evidence to be excluded by an overly technical application of the hearsay rule. However, no such due process concerns exist here.

FN1. There, the court held "[n]othing in the content of Anderson's statement reflects adversely on his character in such a way as to guarantee that it is reliable[ ]" where Anderson stated another individual committed perjury to frame Weber. ( *In re Weber, supra,* 11 Cal.3d at pp. 721-722.) Therefore, even though Anderson was unavailable as a witness, his statement was not admissible as a statement against interest under section 1230 of the Evidence Code on the grounds he would be viewed as a "snitch" in the prison community, because "both the content of the statement *and* the fact the statement was made must be against the declarant's social interest." ( *Id.* at p. 722 [italics added].)

We first consider *Chambers.* Leon Chambers was tried and convicted of shooting a policeman from a hostile crowd of people who had gathered after police tried to execute an arrest warrant on a local youth. ( *Chambers, supra,* 410 U.S. at p. 285-287.) Before Chambers' trial, another individual who had been in the crowd, Gable McDonald, gave a written confession to Chambers' counsel stating he shot the officer: McDonald stated he had already told a friend, James Williams, he shot the officer, and that he used his own nine-shot, .22-caliber revolver, which he discarded after the shooting. ( *Id.* at p. 287.) McDonald was arrested for the crime, but was released from custody after he repudiated his confession at a preliminary hearing. ( *Id.* at p. 288). At his trial, Chambers tried to present a defense that McDonald committed the murder. But Chambers was thwarted in this effort by a "combination of Mississippi's 'party witness' or 'voucher' rule and its hearsay rule [.]" ( *Id.* at p. 294.) First, "petitioner's request to cross-examine McDonald was denied on the basis of a Mississippi common-law rule that a party may not impeach his own witness. The rule rests on the presumption-without regard to the circumstances of the particular case-that a party who calls a witness 'vouches for his credibility.' " ( *Id.* at p. 295.) Second, not only was Chambers precluded from cross-examining McDonald, but "he was also restricted in the scope of his direct examination by the rule's corollary requirement that the party calling the witness is bound by anything he might say. He was, therefore, effectively prevented from exploring the circumstances of McDonald's three prior oral confessions and from challenging the renunciation of the written confession." ( *Id.* at pp. 296-297.) Third, Mississippi did not recognize declarations against penal interest as an exception to the hearsay rule (it only recognized declarations against pecuniary interest), meaning Chambers was not allowed to call three witnesses who could testify McDonald named himself as the murderer on three separate occasions shortly after the crime. (See *id.* at p. 288.) "In these circumstances," the high court concluded, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." ( *Id.* at p. 302.)

*4 Unlike in *Chambers,* the trial court here did not mechanistically apply the hearsay rule to exclude otherwise reliable testimony, nor does appellant's claim "rest[ ] on the cumulative effect of [ ] rulings in frustrating his efforts to develop an exculpatory defense." ( *Chambers, supra,* 410 U.S. at p. 290.) In *Chambers,* McDonald testified he did not shoot the policeman, and was permitted to explain to the jury why he initially confessed to the crime but later withdrew the confession, yet Chambers was not allowed to cross-examine McDonald on account of Mississippi's "arcane" 'voucher' rule. (See *id.* at p. 297 fn. 8.) Here, Outcalt did not even testify. More importantly, the high court concluded the hearsay statements Chambers sought to introduce "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." ( *Id.* at p. 300.) This was because each of McDonald's confessions was "made spontaneously to a close acquaintance shortly after the murder had occurred[,] ... each one was corroborated by some other evidence in the case[,] ... [and] each confession [ ] was in a very real sense self-incriminatory and unquestionably against interest." ( *Id.* at pp. 300-301.) In stark contrast here, Outcalt reported Minaidis' alleged statement almost three years later, and, even if Minaidis made such a statement, it was not made spontaneously to Outcalt shortly after the crime but months

later. Moreover, no corroboration existed for Outcalt's claim Minaidis admitted to the shooting. In addition, Outcalt's statement was thoroughly unreliable for all the reasons outlined by the trial court. Last, as the trial court noted, Minaidis's alleged statement was made under circumstances which throw into question whether it was "unquestionably against [his penal] interest." ( *Ibid.*) In sum, we reject appellant's contention the trial court violated his due process rights by excluding Outcalt's hearsay statements.[FN2]

FN2. At oral argument, appellant discussed at length the "Miller factors" in pressing his Sixth Amendment claim. (See *Miller v. Stagner* (9th Cir.1985) 757 F.2d 988, 994 ( *Miller* ) [describing balancing test to be applied in federal habeas proceeding to determine whether the exclusion of evidence in the state trial court violated habeas petitioner's due process rights].) *Miller* is not binding here. First, this is not a habeas case. Second, *Miller* does not even discuss *Chambers, supra,* but is concerned with exclusion of evidence following prosecutorial misconduct. Third, decisions of the district courts of appeal on federal law are not binding on this court. ( *People v. Williams* (1997) 16 Cal.4th 153, 190.) Under egregious facts, *Chambers, supra,* held where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice-the record wholly fails to support such a claim here.

## II Denial of Motion to Suppress

## A. Facts

Police were dispatched to Matt Cady's house on Indian Valley Road in Novato shortly before 4:00 a.m. on January 22, 2000, after a report of a shooting there. At the suppression hearing,[FN3] Marin County Sheriff Deputy Blair Benzler stated he reported to the scene at around 4:00 a.m. and initially assisted in the search for suspects. Around 5:25 a.m., Benzler was instructed to go to 201 Adams Street and look for a gray Ford truck license number 5T93592 belonging to appellant because he was a suspect in the case. Benzler parked and observed the area for a few minutes. Then he approached the driveway, saw the gray Ford truck, verified the license plate, and felt under the engine to see if it was warm. The vehicle was warm, indicating it had been running recently. Benzler phoned Sergeant Chapman and told him the truck was at the house. Chapman instructed Benzler to stay there and watch the house. Benzler heard someone moving around in the yard of the house, then the sound of digging. A motion sensor light in the yard kept going on and off. Benzler saw what appeared to be flames from a fire reflected in the canopy of the trees above the area, then he smelled smoke. The fire only lasted about a minute, and the smoke smelled like burning fabric, not wood. Benzler thought someone might be destroying evidence, so he contacted Chapman about his concerns About 15 minutes later, other officers arrived, including Chapman, Detective Marziano, and Deputy Hunt. At around 7:00 a.m., Chapman decided to attempt to contact appellant and the assembled officers went through the gate and up to the front door, while Benzler stayed by the gate and watched the yard.

FN3. Appellant sought to suppress items found in his bedroom and trailer, including an expended .40 caliber casing with extractor marks consistent with those on the casing found at the scene, documents belonging to Calkins, and ammunition.

*\*5* Chapman testified he was the Marin County Sheriff Office's SWAT team leader on the night of the shooting. Chapman responded to the Cady residence on Indian Valley Road at about 4:00 a.m. At the back of the house a woman was tending to a man on the ground who had been shot. Cady told the police he recognized Calkins as one of the intruders by his voice, and Paris Stephens told them she had seen Calkins with appellant

earlier that night. In this way, Calkins and appellant were identified as suspects but it was not known at that time which of the suspects fired the shot. One firearm was found at the scene but each suspect was thought to have a firearm. Chapman checked local records and found an address for appellant on Adams Street, Novato. Benzler was sent to Adams Street at about 5:10 a.m. After the call from Benzler about the suspected destruction of evidence at Adams Street, Chapman wanted to send a group of deputies over there. Lieutenant Russell initially wanted to send just one deputy but Chapman convinced him, for reasons of officer safety, the better plan was to send at least four officers. Russell ordered Chapman and the other deputies to accompany Detective Marziano, who would be the person to initiate contact. The police log showed Chapman arrived at Adams Street at 6:44 a.m.

The assembled officers approached the residence quietly on foot, forming a perimeter around the house as they went. Deputy Marziano went through the gate and Chapman came from the sidewalk, over a handrail and onto the deck where he joined Marziano. They knocked on a sliding glass door. Appellant's father answered and Marziano explained they were looking for appellant. The father said appellant was upstairs and motioned for the officers to enter. Chapman saw Marziano go upstairs to the bedroom indicated by appellant's father. There was a woman in bed (Babineaux) who said appellant wasn't in that room. Officers checked other rooms in the house but did not find appellant. After the officers left the house Marziano decided they should search a trailer parked in the driveway. Appellant was found inside the trailer.

At the suppression hearing, Marziano testified Calkins and appellant were identified as suspects through information provided by Matt Cady and Paris Stephens. Cady told Marziano that a week before appellant came to his house, accused him of stealing motorcycle parts, kicked in the door to the shed, and punched out his bedroom window. While at the Cady residence, Marziano also learned appellant was the registered owner of a .40 caliber Smith & Wesson semi-automatic handgun. Marziano went to 201 Adams Street about 6:25 a.m. and met with Benzler. Marziano spoke with Lieutenant Russell and it was agreed police should attempt to make consensual contact with the occupants after additional officers arrived. Marziano said the need for additional officers was for officer safety. Marziano was also concerned about destruction of evidence. At some point between 6:45 a.m. and 7:00 a.m., other officers arrived, including Chapman. Marziano went through a gated entry to the driveway of 201 Adams Street. The gate was closed but not locked. There was no telephone entry system or any signs posted against trespass. Marziano went to the left towards what he thought was the front of the house, where he could see a light on through a sliding glass door. Marziano knocked on the door and Walter Clayton, appellant's father, answered in less than a minute. After Marziano told Mr. Clayton he was looking for appellant, Mr. Clayton said appellant was upstairs in his room. Mr. Clayton walked Marziano in through the kitchen to the bottom of the stairs and pointed up to the master bedroom. After failing to locate appellant upstairs, Marziano came back downstairs and asked Mr. Clayton if police could check the rest of the house. Mr. Clayton agreed. When police did not find appellant in the house, Marziano asked Mr. Clayton if he owned the trailer in the driveway. Mr. Clayton said he owned the trailer and agreed police could search it. Appellant was found inside the trailer at about 7:15 a.m. Marziano applied for a warrant to search the premises and the warrant was served at 2:05 p.m.

*6 Walter Clayton testified at the suppression hearing that he and his wife own 201 Adams Street, and appellant was living there with them. Mr. Clayton said he was awakened by banging on the sliding glass door at the back of the house. Mr. Clayton explained they had their tract home slightly redesigned to take advantage of the views. So although the sliding glass door faced Adams Street, it was not the front door in the conventional sense. The true front door was on the other side of the house and you had to pass through two gates to reach it. Mr. Clayton said the layout can be confusing. He

said that on a dozen occasions over a period of 30 days a person might come to the
sliding glass doors facing Adams Street thinking it was the front door. Mr. Clayton said
he is careful to keep the gates on his property closed to protect his insurance coverage
for the swimming pool. Mr. Clayton testified that after he led Marziano upstairs, he woke
his wife, then went back down to the kitchen because he assumed the police would
question appellant. Next, he noticed a uniformed person go upstairs and tell Marziano
appellant had been found in the trailer. Marziano never asked for permission or consent
to search the trailer before appellant was found. Sometime after appellant was
apprehended and handcuffed, another officer asked Mr. Clayton if they could check the
trailer, according to Mr. Clayton.

In ruling on the suppression motion, the trial court found Marziano credible and no
evidence he was lying or prevaricating about what happened at the Clayton residence.
On the other hand, the trial court found Mr. Clayton was "not particularly credible." Also,
the trial court found Marziano made a legitimate entry onto the Clayton property
"through a reasonably perceived public access way to their premises." Accordingly, the
trial court concluded Marziano's entry into the yard was not a Fourth Amendment
violation. Even if Marziano's entry into the yard violated the Fourth Amendment, the trial
court concluded it was justified by probable cause to arrest appellant coupled with
exigent circumstances. In addition, the trial court found the entry into the house was
incontrovertibly consensual, as was the sweep of the house. The trial court also found by
a preponderance of the evidence Mr. Clayton consented to an search of the trailer, and,
even if he didn't, probable cause and exigent circumstances justified the search.

## B. Analysis

"Our standard of review on appeal from the denial of a motion to suppress is well
established. We defer to the trial court's factual findings where supported by substantial
evidence, but we must exercise our independent judgment to determine whether, on the
facts found, the search and seizure was reasonable under the Fourth Amendment
standards of reasonableness. [Citation.]" ( _People v. Avila_ (1997) 58 Cal.App.4th 1069,
1073-1074.) In reviewing for substantial evidence, "[w]e resolve neither credibility
issues nor evidentiary conflicts[,]" ... "for it is the exclusive province of the trial judge or
jury to determine the credibility of a witness and the truth or falsity of the facts upon
which a determination depends." ( _People v. Maury_ (2003) 30 Cal.4th 342, 403.)

**\*7** Appellant contends the police entry through the gate and onto the Clayton property
violated the Fourth Amendment because the Claytons exhibited a subjective expectation
of privacy in the curtilage of their home-the gated and fenced-off yard area. Appellant
further contends this Fourth Amendment violation was not cured by Mr. Clayton's
subsequent consent to enter the house. Neither of these contentions is convincing.

We acknowledge the Claytons' fenced backyard was part of the curtilage of the
residence and therefore "warrants the Fourth Amendment protections that attach to the
home." ( _Oliver v. United States_ (1984) 466 U.S. 170, 180.) However, police with
legitimate business may lawfully enter that portion of the curtilage that is impliedly open
for the public to use by the normal means of access to and egress from the house, such
as a sidewalk, pathway or driveway. (See _Lorenzana v. Superior Court_ (1973) 9 Cal.3d
626, 629-631.) Here, police were engaged in the legitimate business of seeking to locate
and interview a suspect in a murder case. Police entered the property through an
unlocked gate on the side of the property facing the main public road-Adams Street-and
approached what they took to be the front door of the house. Substantial evidence,
notably Mr. Clayton's testimony about the confusing layout of the house and how
frequently visitors come to the back door, supports the trial court's finding Marziano
made a legitimate entry onto the Clayton property "through a reasonably perceived

public access way to their premises." Thus, we conclude the police did not make an illegal intrusion onto the curtilage of the Clayton property.

Moreover, even if the police entry to the Clayton property was not by implied public access, and was actually an illegal trespass, it did not invalidate the consent subsequently obtained from Mr. Clayton to enter and search the house and trailer. "The existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, however, for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." ( *United States v. Karo et al.* (1984) 468 U.S. 705, 712-713.) Rather, "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' [Citation.]" ( *United States v. Knights* (2001) 534 U.S. 112, 118-119.) In this case, police were hot on the trail of a suspect in a murder case. Police knew Cady had identified Calkins as one of the two intruders. Cady also told police he suspected the other intruder was appellant because appellant came to his home the week before, kicked a door off its hinges and broke a window. Paris Stephens told police she saw Calkins and appellant together earlier that evening. A records check showed appellant lived at 201 Adams Street. Police also identified appellant's vehicle and found it parked outside the Clayton residence with its engine still warm. Thus, police had every reason to believe appellant was on the property and to wish to question him concerning the shooting on Indian Valley Road. In sum, the police entry onto the Clayton property was needed to further the substantial governmental interest in questioning a murder suspect, while it involved a minimal intrusion on appellant's privacy interests. Therefore, even if the police committed an illegal trespass in their approach to the house, and even if such trespass constituted a "search," it was not one we are prepared to deem unreasonable under the Fourth Amendment. (Cf. *People v. Manderscheid* (2002) 99 Cal.App.4th 355, 361 [noting officer's trespass in defendant's backyard was " 'marginally relevant,' but not conclusive, in determining whether the ultimate seizure of the contraband was reasonable" [citation]"].) [FN4]

FN4. Appellant does not dispute that after traversing the curtilage, police entered the house and searched both the house and trailer with his father's consent.

## DISPOSITION

*8 The judgment is affirmed.

We concur: McGUINESS, P.J., and SIGGINS, J.

Cal.App. 1 Dist.,2006.
People v. Clayton
Not Reported in Cal.Rptr.3d, 2006 WL 2686984 (Cal.App. 1 Dist.)
Not Officially Published
(Cal. Rules of Court, Rules 976, 977)
END OF DOCUMENT

**<u>PROOF OF SERVICE BY MAIL</u>**

I, the undersigned, declare:

I am a resident of the City and County of San Francisco, State of California, over the age of eighteen years, and not a party to the within action.  My business address is 595 Market Street, Suite 1350, San Francisco, CA 94105-2825.  On March 20, 2008, I served the within PETITION FOR WRIT OF HABEAS CORPUS on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Post Office mail box, addressed as follows:

Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-3664

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 20, 2008at San Francisco, California.


_____
David McNeil Morse