UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW CLAYTON,

           Petitioner,

  v.

DERRAL G. ADAMS, Warden,
Corcoran State Prison,

           Respondent.
_____/

No. C 08-1542 MHP

**MEMORANDUM & ORDER**

**Re: Denial of Petition for Writ of Habeas Corpus**

      Petitioner Andrew Clayton filed this petition seeking a writ of habeas corpus under 28 U.S.C. section 2254. The matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition is denied.

BACKGROUND

      Petitioner challenges his conviction for the first-degree murder of Christopher Deming. Except where otherwise indicated, these facts have been taken from the California Court of Appeal decision in this case. *People v. Clayton*, No. A104581, 2006 WL 2686984 (Cal. Ct. App. Sept. 20, 2006).

      The chain of events leading to Deming's slaying began the evening of January 21, 2000, when petitioner, his girlfriend and Richard Calkins were at George Minaidis' car repair shop. They received a phone call from a friend who had gone on a day trip to Las Vegas with Deming and Matt Cady. The friend on the phone said Deming and Cady had returned to California without him after stealing methamphetamine from him. Petitioner and Calkins decided to go to Cady's house to

retrieve the methamphetamine, after agreeing that Minaidis would not accompany them because Cady might recognize him. On their way, petitioner and Calkins stopped at petitioner's house to put on stocking masks and rubber gloves, and to arm themselves. Upon arrival, petitioner and Calkins approached the shed Cady used for his drug business. Inside, Cady, Deming and a third occupant were alerted to activity outside by a motion sensor. Deming opened the door, and petitioner and Calkins confronted him. As Calkins struggled with Deming, petitioner fired a single gunshot into Deming's upper torso, and fled the scene. Cady beat Calkins with a baseball bat; however, Calkins managed to escape on foot. He was apprehended by police near the scene shortly thereafter, while petitioner was arrested in a trailer parked on his parents' property.

At the scene of the crime, police recovered an operable and fully loaded .357 Magnum revolver near Deming's body. Docket No. 6-2 (Answer), Exh. B (Court Reporter's Transcript ("RT")) at 1983–84, 2069. At petitioner's house, police found an empty gun case in which the .357 could have fit. *Id.* at 2877–78. Also near Deming's body, police found a fired casing stamped with the letters "ELD" and marked with ".40 SNW," meaning it was a .40 caliber Smith & Wesson shell. *Id.* at 2171, 2245–46. Investigators found a bullet hole on the far wall of the shed consistent with the description of the shooting, and on the other side of this wall they found a deformed bullet. *Id.* at 2171–72, 2178–85. The trial court heard testimony from a licensed gun dealer who testified he had sold petitioner a .40 caliber Smith & Wesson Model 4006 pistol, and a box for such a pistol was found inside petitioner's trailer. *Id.* at 2105, 2688–89. A ballistics expert testified that the characteristics impressed on the deformed bullet recovered from the shed were not inconsistent with a bullet having passed through the barrel of a Smith & Wesson Model 4006 pistol. *Id.* at 2879, 3685–86. In addition, an investigator recovered, shortly after the shooting, two pairs of women's stockings and a pair of rubber gloves on the side of the road a few houses down from Cady's. *Id.* at 2014–16, 2125–27. One of the masks had dried blood on it; after being tested for DNA, the blood was found to be consistent with the known blood sample taken from Calkins. *Id.* at 2048–49, 2255–56, 3874–79. In the second mask, there were traces of human hair. A profile could not be obtained from any nuclear DNA from the hair fragments, but results from tests for mitochondrial

2

DNA were consistent with petitioner's mitochondrial profile. *Id.* at 2787, 2795–2806, 2846–48. The mask itself was tested as well, and DNA from at least three individuals was detected. Petitioner's profile could not be excluded, Calkins's profile could be excluded, and the results were inconclusive as to Minaidis' profile. *Id.* at 3886–88. Similar tests were conducted on the glove, and again, petitioner's profile could not be excluded, but Calkins's and Minaidis' profiles could be excluded. *Id.* at 3895–96. Finally, the prosecution presented evidence that shortly after being apprehended, petitioner's right hand had on it two particles of gunshot residue, which is emitted when a handgun is fired. *Id.* at 2661–63, 2666–67, 2732–35.

Pursuant to a plea bargain, Calkins entered a plea of guilty to voluntary manslaughter and received a determinate 28-year sentence. In exchange, he testified for the prosecution and identified petitioner as the assailant who shot Deming. Calkins's testimony came after he began serving his sentence. During petitioner's May–June 2003 jury trial in Marin County Superior Court, Deputy District Attorney Frugoli and investigator Hutchinson contacted Calkins at the Marin County Jail. Calkins told them he had spoken briefly with John Bixler, an inmate, who in turn had spoken with Paul Outcalt, another inmate. According to Calkins, Outcalt relayed to Bixler that Outcalt had known Minaidis, the car repair shop owner, for his whole life, and that Minaidis had told Outcalt that he had shot Deming.

Hutchinson subsequently interviewed Outcalt, and learned that petitioner had been Outcalt's supervisor when they both worked at Kelleher Lumber, that the two had been housed together at the jail for some period of time, and that Outcalt thought of petitioner as his "big brother." Outcalt told Hutchinson that he had never discussed petitioner's case with petitioner, and that he did not know Calkins was testifying against petitioner at trial. Outcalt also told Hutchinson that when Outcalt helped Minaidis move Minaidis' repair shop to a new location in 2000, Minaidis got annoyed with Outcalt and accused Outcalt of being weak. According to Outcalt, Minaidis then made a statement to the effect that Minaidis had "killed that guy" and was there on the night of the murder. Outcalt said he told Minaidis he did not want to hear any more about it. Outcalt also told Hutchinson that at the time of this statement, he, Outcalt, was on drugs and his mind was not clear about certain things.

3

1    Defense investigator Denise Garety also interviewed Outcalt. Outcalt told Garety that
2 Minaidis admitted to shooting Deming when Outcalt helped Minaidis move Minaidis' shop. Outcalt
3 also said that he did not tell anyone about Minaidis' admission until some years later when he was in
4 a holding cell with Bixler and Bixler told him Calkins was going to testify against petitioner. When
5 Outcalt heard this, he said: "That's bullshit because George Minaidis told me he shot Chris."

6    The trial court conducted a hearing pursuant to California Evidence Code section 402 to
7 determine the admissibility of any testimony that Outcalt might offer. Outcalt was brought to court
8 for a hearing and his attorney informed the court Outcalt would refuse to testify. Outside the jury's
9 presence, Outcalt was nonetheless sworn in, and the prosecutor elicited from him that in January
10 2000, he had been a methamphetamine user. RT at 3261. When the prosecutor asked Outcalt if he
11 had ever been to Minaidis' shop after January 22, 2000, Outcalt refused to answer. *Id.* at 3261–62.
12 When the court ordered him to answer, he said, "Yes," and thereupon the court took over the
13 examination. In subsequent examinations both by the court and the prosecution, Outcalt testified
14 that he had had a conversation with Minaidis in 2000 concerning the Deming murder, and that he
15 remembered the conversation, but refused to answer a question about Minaidis' methamphetamine
16 use. When the court ordered him to answer, Outcalt asked what would happen if he did not answer.
17 When the court explained that he would receive additional, uncreditable time for contempt, Outcalt
18 refused to answer any more questions. *Id.* at 3264–70. Over the course of the trial, Outcalt was
19 brought back on four separate occasions, and on each occasion he expressly refused to testify. *Id.* at
20 3392, 3817–19, 4074–75.

21    Toward the end of petitioner's trial, on June 19, 2003, the defense made a motion for the
22 admission of Outcalt's extrajudicial statements on the ground that they were statements against
23 interest. *Id.* at 4083–85. Defense counsel further argued that under the circumstances of this case,
24 excluding such exculpatory evidence would constitute a violation of petitioner's due process rights.
25 *Id.* The trial court refused to admit into evidence any of Outcalt's prior statements to the prosecution
26 and defense investigators regarding Minaidis' alleged admissions.

27    The trial court found the circumstances surrounding Minaidis' statement to Outcalt
    were ambiguous because it was 'some form of bluster that didn't impress, concern or

4

> frighten him [Outcalt], and in circumstances where Minaidis seems to have been frustrated and angered about something Outcalt says he couldn't figure out.' The trial court noted Outcalt 'reported both that Minaidis said he killed that guy, but also said that he was there the night the guy was killed, whatever the heck that means. It is obviously garbled.' Further, the trial court concluded: 'In any event, if you accept that, and I am not sure it's entirely clear that the Minaidis statement is sufficiently against penal interests to assure credibility, it appears to me that there is no statement of Mr. Outcalt which is sufficiently clearly against his interest to offer any assurance of credibility which would justify it being presented without cross-examination to the jury.' In addition, the trial court found Outcalt's statement was unreliable because appellant was Outcalt's benefactor in the jail, Outcalt's report of the Minaidis statement was remote in time to the purported event, Outcalt's justification for the delay in reporting Minaidis' statement lacked credibility, and appellant and Outcalt lived together in C pod in 2001 for over two months. Moreover, the trial court concluded Outcalt's continued refusal to testify under oath, even after he was told his statements were public knowledge, suggested he 'is concerned about being prosecuted now for making a false statement or for perjury, which he might end up doing if he were to testify.' For all these reasons, the trial court ruled Outcalt's 'hearsay statements are thoroughly unreliable and should not be introduced as a source of little more than confusion in this trial.'

*Clayton*, 2006 WL 2686984, at *3. Petitioner was convicted of first-degree murder, attempted robbery and burglary. He was sentenced to thirty-five years to life in prison. Petitioner appealed. The California Court of Appeal affirmed his conviction, and the California Supreme Court denied review.

Petitioner's claims that the trial court violated his fair trial and due process rights under the Fifth, Sixth and Fourteenth Amendments by excluding evidence of prior, exculpatory statements made by a witness who refused to testify at trial. This petition, having been fully briefed, is ripe for a decision on the merits.

LEGAL STANDARD

The court is required to analyze state habeas corpus claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254. AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of reducing delays in the execution of state and federal criminal sentences." *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).

Under AEDPA, the court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody

5

in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim resulted in a decision that was: 1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or 2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d). In other words, "the question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro*, 550 U.S. at 473.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The California Supreme Court denied petitioner's claims without opinion and the California Court of Appeal issued the last reasoned state court opinion. Thus, this court will review the Court of Appeal opinion under AEDPA standards. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir.2005).

6

DISCUSSION

Petitioner contends that he was not present at the scene of the robbery and homicide, and therefore was not the one who shot Deming. According to petitioner, Minaidis was the shooter. Petitioner further contends that because Minaidis asserted his Fifth Amendment rights, and because the only relevant direct evidence that petitioner was the shooter came from Calkins, an accomplice, the trial court's decision to exclude Outcalt's prior statements was contrary to, or an objectively unreasonable application of, clearly established federal law as determined by the Supreme Court. Specifically, he claims that the exclusion violated federal law established by the Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284 (1973), which held that due process does not allow directly exculpatory evidence to be excluded by an overly technical application of the hearsay rule. *Id.* at 284.

Respondent contends that, as the trial court found, the purported admission by Minaidis to Outcalt is not sufficiently against Outcalt's penal interests to assure credibility. Respondent also contends that Outcalt's hearsay statements to the investigators were unreliable because petitioner was Outcalt's benefactor in jail, Outcalt's report of Minaidis' statement was made three years after the purported event, Minaidis' alleged statement was made to intimidate Outcalt and not as an admission, and by Outcalt's own admission he was using methamphetamine and "his mind [was] not clear about a lot of things" when Minaidis allegedly made the statement. For these reasons, respondent argues the trial court was correct in ruling that Outcalt's hearsay statements are unreliable, and the trial court did not err in finding them inadmissible.

For a determination to be deemed "contrary to" established federal law, the state court must have arrived at a conclusion opposite to one reached by the Supreme Court on a question of law, where the two sets of facts are "materially indistinguishable" from one another. *Williams*, 529 U.S. at 412–13. "It is clearly established federal law, as determined by the Supreme Court, that when a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation." *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004), *citing Chambers*, 410 U.S. at 302.

7

In *Chambers*, the petitioner was tried and convicted of shooting a police officer from a crowd of people who had gathered after police tried to execute an arrest warrant. 410 U.S. at 285–87. Before Chambers's trial, another man who had been in the crowd at the time, Gable McDonald, gave a written confession to Chambers's counsel stating that he had shot the officer. *Id.* at 287. McDonald also orally admitted to his culpability to three friends on separate occasions within days of the shooting. *Id.* at 292–93. He was arrested for the crime, but later repudiated his confession at a preliminary hearing. *Id.* at 288. Chambers claimed his conviction violated due process guarantees because, firstly, he was not allowed to cross-examine McDonald under Mississippi's common law "voucher" rule whereby a party may not impeach his own witness, and, secondly, he was not allowed to introduce testimony of the three people to whom McDonald had confessed, because the trial court ruled their testimony to be inadmissible hearsay. The Court held that Chambers was denied a fair trial in violation of Constitutional guarantees because "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302. Specifically, the Court held that the trial court erred in excluding McDonald's hearsay statements because they were "made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300. The Court specified four factors that established this assurance of reliability regarding McDonald's hearsay confessions:  1) each was made spontaneously to a close acquaintance; 2) each was corroborated by other evidence in the case; and 3) each was against McDonald's interest in a real sense; and 4) McDonald was present and available for cross-examination by the state. *Id.* at 300–01.

The facts of *Chambers* are distinguishable. Firstly, unlike McDonald's confessions, which were made spontaneously and shortly after the murder occurred, Outcalt reported Minaidis' alleged statement nearly three years after it was made, and to a fellow inmate he had met just two months prior. Secondly, whereas McDonald's statements of the incident were corroborated by a written confession, eyewitness testimony and testimony that McDonald was seen with a gun immediately after the shooting, there was no corroborative evidence presented to support Outcalt's claim that

8

1 Minaidis in fact shot Deming. Thirdly, McDonald's statement was indisputably self-incriminatory,
2 and the Supreme Court found he must have been aware of the possibility that disclosing such
3 information would lead to criminal prosecution. Outcalt did not risk anything by offering Minaidis'
4 statements to the investigators. This lack of self-inculpation also distinguishes this case from *Chia*.
5 360 F.3d at 1004–06.

6 As the trial court inferred, Outcalt's refusal to testify at trial was likely based on his fear of
7 being charged with perjury. *Clayton*, 2006 WL 2686984, at *3. His relationship with petitioner as
8 his "big brother" and prison housemate also gave him motive to lie. *Id.* Petitioner contends that the
9 friendship link is a stretch, as petitioner had fired Outcalt when they worked together at Kelleher
10 Lumber. This argument, however, ignores the subsequent months they spent together in jail.

11 Taking these factors collectively, there do not exist circumstances that provide persuasive, or
12 even considerable, assurances of the reliability of Outcalt's statements. Consequently, their
13 exclusion did not violate petitioner's due process rights. *See United States v. Sheffer*, 523 U.S. 303,
14 309–12 (1998) (excluding polygraph evidence does not violate defendant's constitutional right to
15 present a defense; *per se* rule excluding such evidence is a "rational and proportional means of
16 advancing the legitimate interest in barring unreliable evidence"). In any event, since the facts here
17 are materially distinguishable from *Chambers*, the exclusion of Outcalt's statements was not
18 "contrary to" clearly established federal law. For the same reasons, the exclusion was not an
19 "unreasonable application" of clearly established federal law.

20 Petitioner also argues that had Outcalt willfully and falsely claimed no memory of Minaidis'
21 statement while testifying, under California law, his prior inconsistent statements would have been
22 admissible. *See People v. Green*, 3 Cal. 3d 981, 988–89 (1971) (holding that a witness's prior
23 statements are admissible under Evidence Code 1235 when it is reasonable to conclude that the
24 witness' "I don't remember" responses are deliberately evasive and untruthful.). Petitioner claims
25 that here, simply because Outcalt expressly refused to testify, his prior statements were deemed
26 inadmissible hearsay. *People v. Rojas*, 15 Cal. 3d 540, 548 (1975). Petitioner argues that Outcalt's
27 outright refusal to testify is indistinguishable from the scenario in *Green*, because a witness stating

9

"I don't remember" in response to every question is identical to a witness expressly refusing to testify. Therefore, he claims, the witness' prior statements should be admitted regardless of whether the witness takes the stand and simply says "I don't remember," or the witness refuses to take the stand entirely. Petitioner's argument ignores California Evidence Code section 1235, which only allows the admission of prior statements made at the hearing, or under oath. *People v. Williams*, 16 Cal. 3d 663, 667–68 (1976). Here, even assuming Outcalt's refusal to testify did have the same effect as his saying he did not remember, his prior statement, which was made to the investigators, was not made at a hearing or under oath. For Outcalt's statements, or lack thereof, made while he was on the witness stand at petitioner's trial to be inconsistent with a prior statement made at a hearing or under oath, there needs to have been such a prior statement. Here, there is none.

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

IT IS SO ORDERED.

Dated: July 1, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California